**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MARTHA ISABEL PALACIOS,

**Plaintiff,**

-against-

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

**Defendant.**

**17-cv-04802 (ALC)**

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District Judge:**

This is an action challenging the final decision of the Commissioner of Social Security

(the "Commissioner") that Plaintiff Martha Isabel Palacios ("Plaintiff") is not entitled to

disability insurance benefits ("DIB") under Title II of the Social Security Act. Currently pending

are Plaintiff's and the Commissioner's cross motions for judgment on the pleadings pursuant to

Fed. R. Civ. P. 12(c). The Court has considered the parties' submissions and, for the reasons set

forth below, the Court denies the Commissioner's motion, grants Plaintiff's motion and remands

the case for further consideration.

## BACKGROUND

**I.  Procedural Background**

On July 31, 2013, Plaintiff applied for DIB. *See* R. at 42.[1] The Social Security

Administration ("SSA") denied her claim on October 23, 2013. *Id.* Plaintiff filed a written

request for a hearing before an Administrative Law Judge ("ALJ") on December 5, 2013. *Id.*

ALJ Seth Grossman held hearings on July 2, 2015, and on August 31, 2015, at which

Plaintiff appeared and testified. *Id.* ALJ Grossman rendered his decision on October 28, 2015,

---

[1] "R." refers to the Certified Administrative Record filed at ECF Nos. 9-10. Pagination follows original pagination
in the Certified Administrative Record.

finding that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. *Id.* at 36. Plaintiff then requested and was denied reconsideration by the SSA Appeals Council on April 25, 2017. *Id.* at 1.

Plaintiff brought this action on June 26, 2017. ECF No. 1 ("Compl."). On December 5, 2017, Plaintiff moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). ECF No. 14 ("Pl. Br."). The Commissioner filed a cross-motion for judgment on the pleadings on March 7, 2018. ECF No. 18 ("Comm'r Br."). Accordingly, this Court considers the motions fully briefed.

## II.     Factual Background

### A. Plaintiff's Background

At the time that the disability commenced, Plaintiff was a thirty-nine year old woman. She was employed as a home attendant until, on May 24, 2011, she slipped on a wet floor and fell on the job. Pl. Br. at 2, 7. Following the fall, Plaintiff felt pain in her head, left shoulder and right knee. Comm'r Br. at 3. After returning to work for several months,[2] due to the pain in her right knee and left shoulder worsening, she stopped working on September 14, 2012. *Id.* She has not worked since this date. *Id.*

### B. Medical History

#### i.  Treating Source Medical Evidence

On May 17, 2012, Plaintiff received an MRI that revealed a complex tear of the posterior horn of her medial meniscus with involvement of the superior and inferior articular surfaces, a large right knee joint effusion, and osteoarthritic changes in the right knee. Comm'r Br. at 2-3.

---

[2] Plaintiff testified that she stopped working "seven months later." R. at 72. The record reflects that it was it actually closer to 16 months. Though neither the parties nor the ALJ have addressed this apparent discrepancy, it has no bearing on the Court's decision.

On June 4, 2012, Plaintiff was treated by her primary care physician, Dr. Gina Lynch, for her right knee meniscus tear. *Id.* at 3. Dr. Lynch noted that Plaintiff had edema in the right knee, a decreased range of motion with flexion and extension, tenderness to palpation and difficulty walking resulting in a limp due to pain. *Id.*

On October 4, 2012, Dr. Jose Colon, rehabilitative medicine physician, evaluated Plaintiff, noting that there was anterolateral tenderness present in her left shoulder, with abduction limited to 60 degrees and strength decreased to 4/5. *Id.* He also noted that in her right knee, there was a +2 effusion and tenderness in the medial and lateral compartments, and that Plaintiff was walking with an antalgic gait. *Id.* He diagnosed post-traumatic cephalgia, left rotator cuff syndrome in the left shoulder, and an internal derangement of her right knee. *Id.* He also noted that plaintiff's disability was "total." Pl. Br. at 7, *see* R. at 304.

On December 20, 2012, Plaintiff saw Dr. Maxim Tyorkin for an orthopedic consultation. Comm'r Br. at 3. Dr. Tyorkin noted Plaintiff's antalgic gait. *Id.* He also noted that her range of motion in her right knee was 0-100, with normal being 0-140, and that she had pain with deep flexion. *Id.* Dr. Tyorkin noted that Plaintiff was a candidate for right knee arthroscopic surgery. *Id.* On December 26, 2012, Plaintiff received an MRI that revealed a high grade partial thickness rotator cuff tear in the left shoulder involving the distal supraspinatus tendon at the insertion along the greater tuberosity of the humerus, superior labral tear/slap lesion, moderate AC joint hypertrophic arthropathy, and mild inflammatory changes within the subacromial – subdeltoid bursa. Pl. Br. at 7-8.

On January 3, 2013, Dr. Prashanth Mannam included obesity in Plaintiff's past medical history. Pl. Br. at 8. At a January 7, 2013 examination, Dr. Matthew Clarke, a family practice physician, noted Plaintiff's complaints of right knee and left shoulder pain. *Id.* He also noted

that she had marked tenderness to palpation of the medial joint line in her right knee. Comm'r Br. at 3. Plaintiff was remarked to have the capability to lift up to 10 pounds, but have restrictions in lifting, pulling, pushing, carrying, standing, walking, climbing, and kneeling. *Id.* Dr. Clarke recommended left shoulder surgery for Plaintiff.[3] Pl. Br. at 8.

On January 29, 2013, Dr. Lawrence Schulman conducted an Independent Orthopaedic Medical Examination ("IME") of Plaintiff for the Worker's Compensation Board. *Id.* Dr. Schulman noted that Plaintiff had a marked antalgic gait on her right knee with marked swelling, that while she exhibited a full range of extension, her flexion was limited to 115 to 120 degrees, and that she had a right knee derangement with tear of the medial meniscus and degenerative arthritic changes. Comm'r Br. at 4. Dr. Schulman also opined that he agreed Plaintiff needed arthroscopic surgery. Pl. Br. at 8.

In a February 12, 2013 report, Dr. Mannam again listed obesity as part of Plaintiff's past medical history. *Id.* In a February 18, 2013 progress note, Dr. Clarke again noted Plaintiff's complaints of right knee and left shoulder pain, and again recommended left shoulder surgery for the Plaintiff. *Id.* Dr. Clarke also noted that Plaintiff was suffering from depression and that she was directed to continue taking extra strength Vicodin. *Id.*

On March 5, 2013, Plaintiff underwent a right knee arthroscopic surgery performed by Dr. Tyorkin. *Id.* Following the surgery, Plaintiff received physical therapy for a little over four months. *Id.* Despite surgery and physical therapy, Plaintiff still complained of pain in her right knee. *Id.* On April 18, 2013, Dr. Tyorkin reported that Plaintiff's right knee range of motion was 0-90, and her left shoulder range of motion was 0-140 for forward elevation (with normal being 0-180) and 0-130 for abduction (with normal being 0-180). *Id.* at 9. On May 16, 2013,

---

[3] In his report, Dr. Clarke makes repeated reference to Plaintiff's right shoulder; context supports the assumption that he was in fact referring to Plaintiff's left shoulder.

Dr. Tyorkin reported that Plaintiff's range of motion in her right knee was 0-100, and she had pain with deep flexion. *Id.* Plaintiff's range of motion in her left shoulder was 0-140 for forward elevation and 0-130 for abduction, and there was pain when she moved it. *Id.* Dr. Tyorkin reported that Plaintiff had status post right knee arthroscopy and left shoulder supraspinatus syndrome, and that she was a candidate for left shoulder arthroscopy, acromioplasty and debridement. *Id.*

On May 30, 2013, with Plaintiff's husband acting as translator, Dr. Schulman recommended continued physical therapy for the right knee for 4-6 weeks, and a possible Cortisone shot into the right knee. *Id.* On June 6, 2013, Dr. Schulman examined Plaintiff again. Comm'r Br. at 5. Plaintiff's right knee extension was full and her flexion was 120 degrees. *Id.* Dr. Schulman concluded that Plaintiff had a temporary moderate partial disability. *Id.*

Based on an April 18, 2013 examination, Dr. Michael Hearns completed a workers' compensation report regarding Plaintiff's knee and shoulder injuries on June 10, 2013. *Id.* Dr. Hearns noted that Plaintiff's right knee exhibited swelling and limited flexion. *Id.* He also noted that Plaintiff had been prescribed a cane and Vicodin, whose possible side effects include drowsiness and dizziness. *Id.*

On June 28, 2013, Dr. Clarke evaluated Plaintiff for right knee pain, left knee pain, and left shoulder pain. *Id.* at 4. Dr. Clarke stated that Plaintiff was restricted to lifting from five to 10 pounds and had the restrictions listed above, along with bending, reaching, repetitive motions, and cold environments. *Id.* On August 16, Dr. Clarke noted that Plaintiff's right knee pain had improved for two weeks following an injection, but the pain had returned. *Id.* Plaintiff was able to achieve full range of motion in her left knee, despite medial joint tenderness and complaints of pain. *Id.* There was tenderness on palpation of the medial joint line in the right knee. *Id.*

A right knee examination by Dr. Tyorkin on September 19, 2013, revealed a 0-120 degree range of motion and pain with deep flexion. *Id.* at 5. At that time, Dr. Tyorkin noted that Plaintiff's surgical wounds were well-healed, and did not mention any complaints of left knee pain. *Id.*

On September 20, 2013, Dr. Marilee Mescon conducted an internal medicine consultative examination of Plaintiff. *Id.* At that time, Plaintiff was 43 years old with a history of asthma, high blood pressure, with pain in the right knee and left shoulder, 6 inches tall, and 235 pounds, with a broad based, unsteady gait but a normal stance. *Id.* Dr. Mescon noted that Plaintiff made use of a cane always but opined that the cane was "necessary for reassurance even though she [could] walk without the cane." *Id.* Dr. Mescon noted that Plaintiff was able to change, get on and off the examination table, and rise from a chair without help. *Id.* Dr. Mescon reported that Plaintiff had a full range of motion in both knees, with no tenderness, swelling or effusion, and no limitations as regards sitting or standing, although due to knee and shoulder pain she had a limited capacity to climb, push, pull, and carry heavy objects. *Id.* at 5-6.

On September 30, 2013, Dr. Clarke reported that plaintiff complained of pain in the right knee, especially when she walks or sits for long periods of time. Pl. Br. at 11. From October 2013 to April 2014, Plaintiff underwent physical therapy for her right knee, which records show she was tolerating well and was helping her make slow but steady progress. Comm'r Br. at 5. On November 1, 2013, Dr. Clarke reported Plaintiff complained of pain in both knees, and that she could not lift more than five to 10 pounds without exacerbating it. *Id.* at 6. Her right knee had tenderness on palpation of the medial joint line, full extension and 95 degrees of flexion. Her left knee had medial joint tenderness and flexion was to 95 degrees. *Id.* Dr. Clarke opined that

Plaintiff could only lift up to seven pounds, with restrictions in lifting, pushing, pulling, carrying, standing, walking, climbing, kneeling, repetitive motions, and cold environments. Id.

On January 13, 2014, Dr. Clarke reported Plaintiff's continued complaints of right and left knee pain. *Id.* He noted a left knee overuse sprain due to shifting weight onto the left knee, and opined that Plaintiff could only lift up to 10 pounds. *Id.* On March 10, 2014, Dr. Clarke reported that Plaintiff had tenderness and 95 degrees of flexion in both knees, and could lift up to 10 pounds. *Id.* On April 11, 2014, Dr. Michael Reams, occupational medicine specialist, noted that Plaintiff's right knee flexion and extension had decreased in strength. *Id.* On May 2, 2014, Dr. Clarke reported that Plaintiff had mild tenderness to palpation of the medial joint line of her right knee and tenderness on palpation of the anterolateral proximal tibia. *Id.* On May 22, 2014, Dr. Schulman, in preparing an IME report, opined that Plaintiff had reached the maximum medical improvement for her right leg. Pl. Br. at 13.

On July 14, 2014, Dr. Clarke performed an examination that yielded similar results to the March 2014 examination, with the added note that Plaintiff could sit for more than 30 minutes. Comm'r Br. at 7. In August 2014, Dr. Schulman noted that Plaintiff had full extension and flexion to 115 degrees in her right knee. *Id.* On August 18, 2014, Plaintiff's physical therapist indicated that Plaintiff had, in her right knee, 4-/5 flexion strength, 3+/5 extension strength, zero degrees of extension (which was normal), and 120 degrees of right knee flexion, with normal being 135 degrees. Id.; *but see* Pl. Br. at 7 ("normal is 0-140"). A week later another physical therapy note indicated that Plaintiff was making slow but steady progress. Comm'r Br. at 7. On September 15, 2014, Dr. Clarke noted that Plaintiff was complaining of pain in both knees, and that she could not lift more than 10 pounds without exacerbating her left knee pain. Pl. Br. at 14. On September 18, 2014, Dr. Tyorkin reported that Plaintiff still felt right knee pain despite the

surgery, and still felt left shoulder pain as well. *Id.* Right knee range of motion was 0-115 and abduction was 0-120. *Id.*

Also on September 18, 2014, Drs. Jaclyn Gharma and Elina Spektor submitted a psychological evaluation and consultative form that noted that as a result of her physical impairments, Plaintiff was experiencing a heightened level of depression, anxiety and overall psychological distress, which was impacting her ability to function in her life at full capacity. *Id.*

On September 29, 2014, Dr. Mikhail Kogan, pain management specialist, reported that Plaintiff still complained of constant right knee pain and little improvement after the surgery, with the right knee exhibiting swelling, crepitation with flexion and extension, minimal restricting and extension, and tenderness to palpation over the medial aspect; he recommended that Plaintiff receive an injection in her right knee. *Id.* at 15-16. Dr. Kogan also reported that there was decreased range of motion in the left shoulder with abduction, and that Plaintiff was notable to bend her left arm about her shoulder or behind her back. *Id.* Dr. Kogan noted that Plaintiff's medical history was significant for obesity and that Plaintiff walked with a cane. *Id.* at 15.

On November 17, 2014, Dr. Clarke reported that Plaintiff had mild tenderness in the right knee, with full extension and flexion to 95 degrees, and tenderness in the left knee with 95 degrees of flexion, noting restrictions in lifting, pulling, pushing, carrying, standing, walking, climbing, kneeling, bending, and repetitive motions. Comm'r Br. at 8. There were also complaints of pain upon flexion and abduction in left shoulder, with tenderness on palpation of the anterior shoulder joint. Pl. Br. at 16. On November 18, 2014, a functional capacity evaluation noted that Plaintiff was unable to achieve any weight during lifting, carrying, pushing, and pulling. *Id.* On November 20, 2014, Dr. Tyorkin reported that Plaintiff had a right knee

range of motion of 0-115, with pain with deep flexion, that the left shoulder showed impingement, and that the left knee range of motion was 0-110 with pain with deep flexion, parapatellar tenderness and crepitus. *Id.* at 17. Plaintiff received physical therapy from November 2014 through December 2014, and it was noted that she continued to feel pain in both her right knee and left shoulder. *Id.* On December 18, 2014, Dr. Tyorkin reported an examination that yielded results similar to the November 20, 2014 examination. Id.

On January 22, 2015, Plaintiff was reported to weigh 250 pounds. *Id.* On February 19, 2015, Dr. Tyorkin reported that Plaintiff still had pain in her knees and left shoulder, and noted that Plaintiff was a candidate for left shoulder arthroscopy and acromioplasty. *Id.* On February 23, 2015, Dr. Clarke reported that Plaintiff still had pain in both knees despite the right knee arthroscopy and two injections, and that a September 30, 2014 MRI had revealed diffuse anterior cruciate ligament sprain with pericruciate edema. *Id.* It was also noted that Plaintiff still had pain in her left shoulder and could not lift over 10 pounds. *Id.* Plaintiff was scheduled for surgery on March 3. *Id.* On March 3, 2015, Dr. Tyorkin performed left shoulder arthroscopy surgery, left shoulder partial synovectomy, left shoulder debridement, left shoulder partial bursectomy, and left shoulder subacromial decompression and acromioplasty. *Id.* at 18.

Following these procedures, on May 11, 2015, Plaintiff reported that despite the surgery she still had pain in her left shoulder, along with pain in both knees. *Id.* On May 21, 2015, Dr. Tyorkin reported that the left shoulder range of motion was 0-90 for forward elevation and 0-90 for abduction. *Id.* at 19. Right knee range of motion was 0-120, with pain with deep flexion. *Id.* Left knee range of motion was 0-115, with parapatellar tenderness and crepitus. *Id.*

On June 1, 2015, Dr. Mannam treated Plaintiff for active asthma, noting that Plaintiff was obese. *Id.* On June 4, 2015, Plaintiff was treated in the Emergency Department of Jacobi

Medical Center for productive cough, with greenish phlegm and bilateral rates/wheezing, chest tightness and shortness of breath in connection with her asthma. *Id.* On June 26, 2015, Dr. Mannam reported that Plaintiff suffers from bilateral knee OA, asthma, HTN and morbid obesity, was waiting for left knee surgery, and was temporary disabled. *Id.* On November 6, 2015, Plaintiff received a Synvisc injection in her right knee. *Id.* at 20. On December 4, 2015, Dr. Richard Pearl, reported crepitation of the patellofemoral joint in the right knee, and indicate that Plaintiff would get another Synvisc injection in a month. *Id.* Dr. Pearl also informed Plaintiff that a knee replacement was probably necessary in future. *Id.*

On January 2016, Dr. Clarke reported that Plaintiff continued to have pain in both knees and the left shoulder, that she was still limited to lifting no more than 10 pounds, and that she had to use a cane to walk. *Id.*

### ii. Testimonial Evidence

At the July 2, 2015 hearing, Plaintiff testified with the help of an interpreter. R. at 60. Plaintiff testified that she was a 44 year old woman from Honduras, who came to the United States at age 19 and had a sixth-grade education. *Id.* at 70-71. She testified that she understood a little English; however, when the ALJ directed her to respond to his questions directly in English, she displayed a lack of ability to do so. *Id.* Plaintiff said that she last worked on September 6, 2012, as a home attendant, for which she had taken a class (in English) and taken an exam (in Spanish), but was not working now due to the deterioration of her health. *Id.* at 71-72.

Plaintiff testified that she had fallen at work, and took three days off at the direction of the hospital [physicians]. *Id.* at 72. She returned to work after the three days, but started having swelling in her right knee months later, upon which she stopped working. *Id.* When she first

noticed the swelling she went to her primary care physician, who sent her to an orthopedist. *Id.* at 73. The orthopedist gave her injections and indicated that she needed knee surgery. *Id.* Following the surgery, which occurred on March 5, 2013, Plaintiff started using a cane for support. *Id.* Plaintiff also testified that she had undergone an operation on her left arm on March 3, 2015 for her shoulder problem, that she had pain in her left knee for which she had begun receiving therapy in June of 2015, that she had high blood pressure, and that she had asthma. *Id.* at 73-74. Plaintiff testified that she was last in the emergency room for asthma on June 4, 2015. *Id.* at 74.

Plaintiff testified that she used to be able to lift up to 15 pounds, but now believed she could not lift more than 2-3 pounds. *Id.* at 74-75. Finally, Plaintiff said that she had been seeing a psychiatrist for depression since October 2014, though she was not taking any psychiatric medicine. *Id.* at 76, 79. During this line of questioning, the ALJ noted that Plaintiff was at times answering the question before it was interpreted. *Id.* at 79.

At the August 31, 2015 hearing, Plaintiff testified that she was an American citizen, having taken the citizenship test (in Spanish) after going to school to prepare for it (in English). *Id.* at 1475. She further testified that she was able to speak and read and write "a little bit" of basic English. *Id.*

Plaintiff then testified as to how she had spent her Sunday. *Id.* at 1477. She got up at 8, took a shower and put on her robe. *Id.* She ate breakfast, made by her 28 year old daughter, and then read the Bible before she went to church. *Id.* at 1477-78. Her brother drove her to and from church, after which she had lunch, made by her daughter. *Id.* at 1478. Plaintiff then took her medication and "lay down" for two hours. *Id.* at 1479. When she woke up, Plaintiff did physical

therapy by walking in the hallway for 30 minutes, as directed by her therapist. *Id.* Plaintiff then watched some TV, prayed, and read the Bible again. *Id.*

Plaintiff testified that she could lift 5-10 pounds, and that she did not think she could do a job that required her to sit for an extended period of time, because she experiences pain in her knee. *Id.* at 1480. She testified that she had pain in both knees and her left arm, and that she was right-handed. *Id.* at 1484.

Plaintiff finally testified that she was under psychiatric treatment once a week for depression. *Id.* at 1485. Describing her experience, she said that she "[cries] easily," "wants to be alone" and "doesn't feel like being with other people socially," and "feels like there's something that [she] need[s], something that's lacking." *Id.*

At this hearing, Dr. Dorothy Kunstadt also testified as a medical expert. R. at 1489-91. Dr. Kunstadt testified that Plaintiff's injury was not of the type to prevent someone from doing a desk job. *Id.* at 1490. She further testified that nothing in the record would indicate that Plaintiff could not perform sedentary work, after the ALJ clarified that someone doing sedentary work should be able "to sit up to six hours, stand or walk up to two hours in an eight-hour day. . . . [A] normal job has a . . . 15 minute break in the morning, 15-minute break in the afternoon, a half an hour to hour for lunch." *Id.* Dr. Kunstadt went on to testify that Plaintiff did not meet, and had not met at any point since the alleged onset date, any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. *Id.* Finally, Dr. Kunstadt went into detail about how the record indicates that Plaintiff could perform sedentary work, noting that Plaintiff's symptoms were "mainly related to her right knee" while recognizing that Plaintiff had "some restrictions reported in her left shoulder, which would impair her lifting above the head." *Id.* at 1491.

Michele Erbacher also testified as a vocational expert. *Id.* at 1493-95. Erbacher confirmed the ALJ's characterization of Plaintiff's past relevant work of home health aide as medium exertional work, and also confirmed that this meant that Plaintiff, due to her limitation to sedentary work, could not return to her previous occupation. *Id.* at 1493; *see id.* at 50. Erbacher went on to claim that a hypothetical person of Plaintiff's age, education and work experience who was limited to sedentary work, with the added limitations of simple instruction tasks, occasional at most contact with supervisors, coworkers and the public, and no exposure to concentrated chemicals and pollutants, could perform the jobs of addresser, tube operator, document preparer and ticket checker. *Id.* at 1494. With regard to the job of document preparer, Erbacher pointed out that the Dictionary of Occupational Titles ("DOT") description was outdated and explained what the job now entailed. *Id.* at 1495.

## LEGAL STANDARD

### I. Judicial Review of the Commissioner's Determination

A district court reviews the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).

The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.

1994)).  In other words, this Court must afford the Commissioner's determination considerable

deference, and may not "substitute its own judgment for that of the [Commissioner], even if it

might justifiably have reached a different result upon a de novo review." *Jones v. Sullivan*, 949

F.2d 57, 59 (2d Cir. 1991) (internal quotation marks and citation omitted).

## II.     The Commissioner's Determination of Disability

### A.     Definition of Disability

A disability, as defined by the Social Security Act, is one that renders a person unable to

"engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A);

*accord* 42 U.S.C. § 1382c(a)(3)(A).  Further, "[t]he impairment must be 'of such severity that

[the claimant] is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy.'" *Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000) (quoting

42 U.S.C. § 423(d)(2)(A)).

### B.     The Commissioner's five-step analysis of disability claims

The Commissioner uses a five-step process to determine whether a claimant has a

disability within the meaning of the Social Security Act.  *Curry v. Apfel*, 209 F.3d 117, 122 (2d

Cir. 2000); *see* 20 C.F.R. §§ 404.1520(a)(4).

This inquiry proceeds as follows.  First, the Commissioner determines whether the

claimant is employed.  *Curry*, 209 F.3d at 122.  Second, if the claimant is unemployed, the

Commissioner considers whether the claimant has a "severe impairment" that "significantly

limits his physical or mental ability to do basic work activities." *Id.*  Third, if the claimant

suffers from such an impairment, the Commissioner determines whether that impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of the Social Security Act regulations, meaning it conclusively requires a determination of disability. *Id.*; *see* 20 C.F.R., Part 404, Subpart P, App'x 1. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity ("RFC") to perform her past work. *Curry*, 209 F.3d at 122. Finally, if the claimant is unable to perform his past work, the Commissioner determines whether there is other work which the claimant could perform. *Id.*

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and 'bears the burden of proving his or her case at steps one through four.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). However, at step five, "the burden shifts to the Commissioner to show that there [are] a significant number of jobs in the national economy that [the claimant] could perform based on his residual functional capacity, age, education, and prior vocational experience." *Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004) (citing 20 C.F.R. § 404.1560).

## THE ALJ'S DECISION

The ALJ first found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017. R. at 44. The ALJ then proceeded to go through the necessary five-step analysis.

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, September 14, 2012. *Id.*

At step two, the ALJ determined that Plaintiff has the following severe impairments: internal derangement of the right knee, left shoulder tendinosis with partial thickness tear of the

distal supraspinatus, asthma and depression. *Id.* The ALJ [found] that these impairments cause more than minimal limitation in Plaintiff's ability to perform basic work-related activities and are therefore considered "severe". *Id.*

At step three, the ALJ determined that Plaintiff's impairments or combination of impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). R. at 44. The ALJ gave specific consideration to listings 1.02, 3.03, 12.04 and 12.06. R. at 45. The ALJ determined that the "paragraph B" criteria were not satisfied because Plaintiff had only "mild" restriction in daily living and social functioning; "moderate" difficulty in concentration, persistence or pace; and suffered no episodes of decompensation of extended duration. *Id.* Furthermore, there was no indication from any of the treating, examining or non-examining medical sources that Plaintiff's impairments medically equaled the criteria of any listed impairment. *Id.*

The ALJ determined that Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), with the added limitations of only simple tasks and only occasional interactions with supervisors, co-workers and the public, and no exposure to concentrated pollutants or chemicals. *Id.* at 46. The ALJ found that, contrary to her representations, Plaintiff was not illiterate in English; however, the ALJ expressed that even if she did not speak English the ultimate decision in the case would stay the same. *Id.*

Given this determination of RFC, at step four, the ALJ determined that Plaintiff was unable to perform the requirements of her past relevant work– *i.e.*, the requirements of a home attendant. *Id.* at 50.

Finally, at step five, the ALJ determined that, considering Plaintiff's age education, work experience and RFC, there were jobs present in the national economy in significant numbers that could be performed by Plaintiff. *Id.* at 51. This determination relied on the testimony of the vocational expert that Plaintiff could perform the duties of occupations such as addresser, tube operator, document preparer and ticket checker. *Id.*

## DISCUSSION

Plaintiff argues that the ALJ's decision was not supported by substantial evidence because the ALJ failed to consider Plaintiff's obesity, left knee joint derangement, use of a cane and the side effects of her medication in determining her RFC, and that the ALJ failed to apply the correct legal standard to the evidence when concluding that Plaintiff was able to communicate in English and in his consideration of the vocational expert's testimony. Pl. Br. at 1, 21, 26.

## I.   Failure to Consider Evidence

### a.  Consideration of Obesity

Plaintiff argues that the ALJ failed to consider her obesity in making his RFC determination, especially when combined with her other ailments. An ALJ is required to evaluate the impact of a plaintiff's obesity on their impairments. *Daragjati v. Colvin*, No. 14-CV-2727 (BMC), 2015 WL 427944, at \*5 (E.D.N.Y. Jan. 31, 2015). Obesity can be a severe impairment on its own or when combined with other impairments. *Id.* "The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately." *Id.* (quoting 20 C.F.R. § 404 app. 1, 1.00Q[4]). However, the

---

[4] § 404 app. 1, 1.00Q continues: "Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity."

ALJ's obligation to consider obesity "diminishes where evidence in the record indicates the claimant's treating or examining sources did not consider obesity as a significant factor in relation to claimant's ability to perform work related activities." *Daragjati*, 2015 WL 427944, at *5 (quoting *Farnham v. Astrue*, 832 F. Supp. 2d 243, 261 (W.D.N.Y. 2011)). Moreover, there is no basis for an ALJ to conclude that the addition of obesity created a disabling combination of impairments if no doctor has so opined, or at least suggested that obesity was an aggravating factor. *Daragjati*, 2015 WL 427944, at *5.

Here, although Plaintiff's obesity was mentioned throughout the record, not once was it mentioned as a compounding factor in Plaintiff's impairments. *See, e.g.*, R. at 308, 311-12, 985-86, 1221, 1223-28, 1263-64. Considering the medical sources' lack of suggestion that Plaintiff's obesity played any serious role in her impairments, the ALJ did not err in declining to consider it when determining Plaintiff's RFC.

### b. Consideration of Left Knee Joint Derangement

Plaintiff alleges that the ALJ erred in failing to consider her diagnosis of a joint derangement in her left knee. The Commissioner argues that, although the ALJ's decision did not explicitly mention Plaintiff's left knee derangement, he nonetheless adequately accounted for that evidence. In making this argument, the Commissioner relies on *Stanton v. Astrue*, which dismissed a similar claim as waived but noted that:

> [e]ven if [they] were to reach the merits of [Claimant's] argument, [they] would not identify error . . . because the ALJ did identify severe impairments at step two, so that [Claimant's] claim proceeded through the sequential valuation process. Further . . . the ALJ's decision makes clear that he considered the "combination of impairments" and the combined effect of "all symptoms" in making his determination.

370 F. App'x. 231, 233 n.1 (2d Cir. 2010).

Thus, remand was unwarranted in *Stanton* not only because the totality of impairments and symptoms were considered, but because the ALJ nonetheless proceeded to conduct the five-step analysis on account of the impairments the ALJ identified. Regardless of explicit mention, the ALJ took into account the plaintiff's symptoms to the extent that they were documented in the record; thus, any symptoms pertaining to the plaintiff's disc herniation would have been part of the ALJ's RFC calculus. *Id.*; *see Santos v. Astrue*, 709 F. Supp. 2d 207, 211 (S.D.N.Y. 2010) ("An ALJ 'is not required to discuss all the evidence submitted, and his failure to cite specific evidence does not indicate it was not considered.'") (quoting *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005)).

So, too, here: the ALJ identified four severe impairments in his step two analysis, allowing the analysis to move on to step three. R. at 44. The ALJ represented that "[i]n making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and [Social Security Rulings ("SSRs")] 96-4p and 96-7p." R. at 46. The ALJ gave significant weight to the conclusions of Dr. Clarke, who repeatedly noted and took into account the pain in Plaintiff's left knee; namely, his conclusions that Plaintiff could perform sedentary work and lift up to 10 pounds. R. at 49. Therefore, although the ALJ did not identify Plaintiff's left knee joint derangement as a severe impairment under step two analysis, he did consider her symptoms in determining her RFC, and thus did not err in that regard.

### c. Consideration of Cane Usage

Plaintiff alleges that the ALJ erred in failing to consider her use of a cane. Pursuant to SSR 96-9p, to find that a hand-held assistive device like a cane is medically required, there must be medical documentation establishing the need for such device to aid in walking or standing, and describing the circumstance for which it is needed. SSR 96-9p, 1996 WL 374185 at *7 (July 2, 1996). Plaintiff cannot, however, point to such documentation in the record. In fact, in her report following an Internal Medicine Examination of Plaintiff, Dr. Mescon opined that the cane was "necessary for reassurance even though she can walk without the cane." R. at 532. What's more, the ALJ cited this very report in his decision. *See* R at 48-49. Thus, not only did the ALJ not err by failing to consider Plaintiff's use of a cane since he did consider it, but even if he had not, there is no documentation in the record that would have caused consideration to change the determination made by the ALJ of Plaintiff's RFC.

### d. Consideration of Side Effects of Medication

Plaintiff alleges that the ALJ erred in failing to consider the side effects of the medication she takes, arguing that SSR 96-7p requires consideration of "the type, dosage, effectiveness, and side effects of any medication the individual take or has taken to alleviate pain or other symptoms." Pl. Br. at 25 (quoting SSR 96-7p, 1996 WL 374186 at *3 (July 2, 1996)). This consideration is meant to be in addition to "objective medical evidence when assessing the credibility of an individual's statements." *Id.* Plaintiff relies on *Arias v. Astrue*, 2012 WL 6705873 (S.D.N.Y. Dec. 21, 2012) to support her allegation. The *Arias* Court reversed for an ALJ's failure to account for certain testimony regarding the side effects of that plaintiff's medication. 2012 WL 6705873, at *4.

Here, however, not enough evidence of side effects was presented in the first instance. As far as the individual statements go, Plaintiff did not state before the ALJ that her medication had any side effects, let alone any side effects that would affect her ability to do work. Plaintiff points out that she testified that after she took her medication, she took a nap for about two hours. Pl. Br. at 25. Yet Plaintiff does not posit any causation between these two events in her testimony, nor does she allege that her naps–to the extent that more than one has occurred–are habitual.

To be sure, several medical evaluations in the record indicate that drowsiness is a side effect of her medication and that it will impact her functional abilities. *See* R. at 363, 371, 377, 382, 557, 604, 609, 715, 747, 944, 1046, 1170, 1441. Plaintiff did not offer any testimony stating that she suffers from drowsiness as a side effect of her medication, and did not offer any testimony denying such an effect. However, as the Commissioner points out, it is the burden of Plaintiff to produce evidence to support any additional limitations in the RFC due to her medications. Comm'r Br. at 18. Plaintiff, in relying on the notes in the record and not providing affirmative testimony as to the reality of the side effects, has not met that burden. Therefore, the ALJ did not err in failing to consider the side effects of Plaintiff's medication.

## II.    Correct Legal Standard

### a.  Plaintiff's English Language Ability

Plaintiff alleges that the ALJ erred in finding that she was able to communicate in English. Plaintiff testified with the help of a Spanish language interpreter, and was unable to respond in English when directed to do so by the ALJ. Pl. Br. at 1-2. Plaintiff points to these facts, along with the fact that she only received a sixth grade education from Honduras, in an effort to dispute the ALJ's finding. However, Plaintiff's medical records indicated that

Plaintiff's primary language for healthcare information was English and that Plaintiff herself spoke English. R. at 46, 71-72, 1263, 1268. During the first hearing, the ALJ attempted to test Plaintiff's English ability by briefly refusing to let the interpreter translate his questions for her and ordering her to respond in English, which proved unsuccessful. R. at 70-71. However, later in the hearing, the ALJ noted that at times Plaintiff was answering before the interpreter could translate. R. at 79.

The Second Circuit has held that even a brief exchange in English between an ALJ and a claimant "is not a substitute for a determination on the question of ability to communicate in English." *Lugo v. Chater*, 932 F. Supp. 497, 502 (S.D.N.Y. 1996) (quoting *Vega v. Harris*, 636 F.2d 900, 904 (2d Cir. 1981)). When asked by the ALJ during the second hearing whether she could speak, read and write basic English, Plaintiff responded, "[a] little bit." R. at 1475. The ALJ then represented to the vocational expert, via a hypothetical, that Plaintiff "can read and write basic English, but, you know, simple English but not more than that." *Id.* at 1493-94.

It seems to follow that the ALJ's representation of Plaintiff's English ability comported with Plaintiff's own representation thereof. *See Perez-Rodriguez v. Astrue*, No. 10-CV-9346 (NRB), 2011 WL 6413763, at *11 (S.D.N.Y. Dec. 21, 2012) ("Plaintiff challenges the assumptions that she could 'carry on a basic conversation in English' and could 'make out forms and job applications and such.' . . . While plaintiff's objections in this regard are understandable, we note that plaintiff did suggest that she can understand a basic conversation in English and she did state that she can understand—at least to a fair degree—articles in the *New York Post*."). To the extent that Plaintiff's and the ALJ's assessments of Plaintiff's English ability at all varied, the ALJ pointed to places in the record that provided substantial evidence allowing him to make his determination. R. at 46; *cf. Lugo*, 932 F. Supp. at 502 (finding that the ALJ provided no

explanation for his assessment of Claimant's ability to communicate in English). Therefore, the ALJ did not err in his determination of Plaintiff's RFC based on Plaintiff's limited English ability, or in his representation of Plaintiff's English ability in the hypothetical presented to the vocational expert.

### b. Vocational Expert's Testimony

Plaintiff points to the ALJ's reliance on the vocational expert's testimony as another source of error. Remand is warranted, Plaintiff argues, because the ALJ relied upon inadequate testimony from the vocational expert. She specifically complains of the vocational expert's failure to provide regional numbers for the suggested jobs and account for discrepancies between her testimony and the DOT job descriptions.

### i. Failure to Provide Number of Regional Jobs

Plaintiff argues that the vocational expert erred by failing to give the number of regional jobs available in addition to the number of national jobs available. The relevant SSR provides that when a vocational expert gives a determination, "the determination or decision will include 1) citations of examples of occupations/jobs the person can do functionally and vocationally and 2) a statement of the incidence of such work in the region in which the individual resides or in several regions of the country." SSR 83-14, 1983 WL 31254 at *6 (Jan. 1, 1983). However, as the Commissioner notes, the regulations state that "work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country. It does not matter whether . . . work exists in the immediate area in which you live." 20 C.F.R. § 404.1566(a)(1). The Commissioner cites cases reflecting this and Plaintiff cites no cases to the contrary. *See Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009); *Gutierrez v.*

*Comm'r of Soc. Sec.*, 740 F.3d 519, 523-24 (9th Cir. 2014). Accordingly, the vocational expert's testimony cannot be faulted on this basis.

### ii. Adequacy of Vocational Expert Testimony

Finally, Plaintiff argues that the vocational expert's testimony about the jobs Plaintiff could perform impermissibly varied from the DOT definitions of those jobs and with the ALJ's RFC determination. The Court agrees.

When a claimant has established that his impairment prevents his return to his prior employment, the Secretary must put forth evidence to establish the existence of alternative substantial gainful work which the claimant could perform. *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984). "[T]he ALJ ha[s] [a] duty to sufficiently question the vocational expert to ensure that the suggested jobs align with the claimant's RFC profile." *Rosario v. Colvin*, 15-CV-8078 (AJP), 2016 WL 3866372 at *7 (S.D.N.Y. July 13, 2016). "An ALJ may make its determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as "there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion." *Id.* (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983)). However, "[w]here there is an unexplained and direct contradiction of the DOT, the expert's testimony does not constitute substantial evidence to support a finding that jobs are available." *Pettaway v. Colvin*, No. 12-CV-2914 (NGG), 2014 WL 2526617, at *13 (E.D.N.Y. June 4, 2014) (citing *Mimms*, 750 F.2d at 186; *Jasinski*, 341 F.3d at 185); *see Rosario*, 2016 WL 3866372 at *7 (collecting cases in support of proposition that "[w]here . . . discrepancies between the RFC and the available jobs

exist, further vocational expert testimony is needed to ensure that the claimant would be able to complete the tasks required in the proposed jobs.").

Plaintiff contends that the occupations that the vocational expert suggested had higher GED levels than that of Plaintiff, and that the vocational expert's testimony failed to account for this discrepancy. More specifically, "[t]he two occupations with the lowest [GED] levels were addresser and tube operator. These occupations required a GED level of Reasoning ('R') 2, Math ('M') 1 and Language ('L') 2." Pl. Br. at 28. "The two other occupations identified by the vocational expert were Document Preparer and Ticket Checker, and both of these require a greater GED level than addresser and tube operator." *Id.* at 29 (stating that these two occupations required level 3 reasoning). A reasoning level of "2" requires an individual to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions," to 'read at rate of 190-215 words per minute," and "write compound and complex sentences," according to the DOT. DOT, App'x C. In jobs that implicate Level 1 reasoning, a worker will "[a]pply commonsense understanding to carry out simple one-or two-step instructions [and][d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.*

A consensus of courts agree that "an RFC that limits a claimant to only simple and routine tasks is consistent with GED level 2 reasoning." *Rivera v. Colvin*, No. 11-CV-7469 (LTS) (DF), 2014 WL 3732317 at *42 (S.D.N.Y. July 28, 2014) (collecting cases). *But see, e.g.*, *Pettaway*, 2014 WL 2526617, at *12 ("The ALJ asked the vocational expert about jobs that would fit the profile of a hypothetical individual who could 'follow and understand *simple directions and instructions* and perform simple tasks independently.' . . . This most closely fits with the description provided for Level 1 Reasoning."). Here, the vocational expert identified

and presented four jobs for Plaintiff, the two *least* complex of which had GED levels of 2 for reasoning. Plaintiff, as determined by the ALJ, could only perform simple instruction tasks. This was posed in the ALJ's hypothetical to the vocational expert, along with a request that the vocational expert account for any discrepancies between her testimony and the DOT. Nonetheless, the vocational expert failed to account for discrepancies as to at least two of the jobs she had proposed (regardless of whether this limitation comports with level 1 or 2).

The Commissioner attempts to minimize this deficiency, arguing that any conflict is "speculative." Comm'r Br. at 22. In light of the above-discussed case law, and the Commissioner's failure to cite any cases to the contrary, the Court does not perceive how the conflict is "speculative" or may otherwise be overlooked.

Indeed, as alluded to above, while the existence of a conflict does not preclude the ALJ from giving greater weight to the vocational expert's testimony upon proper consideration, part of that consideration involves having the opportunity to *inquire* into the nature of the discrepancy. *Pettaway*, 2014 WL 2526617, at *13; *see Santos v. Astrue*, 709 F. Supp. 2d 207, 212 (S.D.N.Y. 2010). Though the vocational expert did inform the ALJ that one of the occupations (document preparer) had undergone changes in the way it was performed, this clarification did not address the above-described deficiencies with the testimony regarding the remaining occupation descriptions. R. at 1495 ("[T]his is an occupation removing staples, binding materials, or clips from a file and making all pages single pages in preparation for scanning, which is done by another worker. The old DOT definition was an occupation preparing documents for storage on microfiche . . . ."); *see, e.g.*, *Sanchez v. Barnhart*, 329 F. Supp. 3d 445, 454 (S.D.N.Y. 2004) (reversing and remanding even where vocational expert's failure to account for discrepancy pertained only to two of four jobs, reasoning that the Court was "in no position t

to conclude that the remaining two jobs exist in sufficient numbers in the national and local economy as to satisfy the fifth prong of the disability test and preclude remand").

In that regard, the ALJ did not seem to have been apprised of the fact that there was a discrepancy. In his decision, the ALJ claims that "pursuant to SSR 00-4p, [he] has determined that the vocational expert's testimony is consistent with the information contained in the [DOT]." R. at 51; *see Boone v. Barnhart*, 353 F.3d 203, 208 (3d Cir. 2003) ("Neither the [vocational expert] nor the ALJ in his opinion acknowledged the conflict between the [expert]'s testimony and the DOT or explained why the [expert]'s testimony should be relied on despite the conflict."). Although the ALJ is allowed to hold the vocational expert's testimony above the DOT descriptions, the ALJ must "elicit a reasonable explanation for the conflict before relying on the [vocational expert] . . . evidence to support a determination or decision about whether the claimant is disabled." *Decker v. Comm'r of Soc. Sec.*, No. 3:13-cv-662 (GLS), 2014 WL 2176960 at *4 (N.D.N.Y. May 22, 2014). Because the ALJ did not do so here, the Court concludes that, at step five of the analysis, the Commissioner did not meet her burden of proving there were jobs in the national economy that Plaintiff could perform.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings is **GRANTED**, and the Commissioner's motion for judgment on the pleadings is **DENIED**. This matter is **REMANDED** for further proceedings consistent with this opinion.

The Clerk of Court is directed to close this case, without prejudice to its being reopened in the event additional proceedings in this Court are warranted following remand.

**SO ORDERED.**

**Dated: September 24, 2018**
**New York, New York**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**